Parker, J.
In this case the plaintiff in error, Steele, was plaintiff below, and filed his petition in the court of common pleas, charging the defendant, Edwards, with having uttered and published of, and concerning him, Steele, a certain libelous writing. The words of the alleged libel which were written upon a postal card and mailed at the post office at Bowling Green, are as follows:
“Bowling Green, 0., Mch. 30th, 1896.
“Mr. Bert Steele:
“I want you to call and settle for the fodder you were kind enough to take Saturday without permission. Call and settle at once.
“Yours,
“William Edwards.”
It is alleged in the petition, that the meaning of these words, as used by Edwards,' was, that Steele had been guilty of grand larceny in taking the fodder referred to, and that therefore, the words were libelous and actionable. It is also averred in the petition, that before the time of writing and mailing the postal card, the defendant had asserted that a certain brad of his fodder had been stolen. The defendant, for answer to this petition, denies each and every allegation contained in the petition, denying therefore, necessarily, all the averments contained in the innuendo, which *54 impute to the language used the meaning alleged; that is, a charge that Steele had committed the offense of grand larceny; and then the answer proceeds to explain the circumstances of the writing and mailing of the card, as follows:
“That a person other than the plaintiff,who,as defendant was reliably informed, was named Bert Steele, was indebted to him for a load of fodder which said person had taken and hauled away from the defendant’s premises during the absence therefrom of defendant. That the defendant, who can neither read or write, instructed his daughter to write to said person, requesting him to call and pay for said fodder, whereupon she did write the postal card mentioned in the petition, and the same was mailed accordingly. That said postal card was not intended for the plaintiff, nor to be delivered to him, and defendant so informed plaintiff when he learned that said card had come into his possession. That if said card was delivered to the plaintiff by Post Office Department, it was through mistake, growing out of the identity of the name of the plaintiff with that of the person for whom it was intended, and to whom it was addressed.”
The reply denies that any person named Bert Steele, was ever indebted to the plaintiff for any load of fodder, and denies that the defendant ever had any information, reliable or otherwise, as to any man named Bert Steele, having taken any fodder from the farm of defendant. Denies that defendant did not intend to have said card mentioned in the petition delivered to plaintiff. Denies that there was any mistake on the part of defendant arising from the identity of plaintiff’s name with any other person’s name, to whom defendant intended to address said card. The reply admits that the daughter of the defendant wrote the card under the direction of the defendant, but denies that the same was a request, or intended as a request, for any person to call and pay for the fodder, and denies every other allegation in the answer not admitted in the reply, to be true.
After the plaintiff had rested his case, the court, on’ motion of the defendant, withdrew the case from the consider *55 ation of the jury, and directed the jury to return a verdict for the defendant, which the jury did, and because of this action of the court below, error is prosecuted in this court. No'w, whether the words appearing upon this postal card were libelous, is a question for the court, — a question of law. That is to say,, whether the words alone, without having any special or unusual meaning attached to them by the aid of averment of additional explanatory facts,— whether appearing by themselves without such aids, they were libelous or not, is a question for the court,)and this court is of the opinion, that the natural import of the words does not convey a libelous meaning; that there is nothing about the language used, when given its ordinary significance, that imputes to the defendant the crime of grand larceny or any other crime, or any act upon his part, that would tend to disgrace him, or render him ridiculous,— anything in short, that would make it libelous.
A writing however, which may not be libelous on its face, may be shown to.have been used and understood in a libelous sense. It may be so understood by reason of the situation of the parties; by reason of extraneous facts not appearing upon the face of the writing itself — words that, according to their ordinary signification, may be entirely innocent, or might, under certain circumstances, be understood by persons hearing or reading them, in a sense carrying a charge or implication of crime, or something that would make them libelous. Counsel for the plaintiff m this case, evidently did not regard these words as libelous upon their face, and therefore undertake to set forth in the petition, certain extraneous facts with relation to which the words were uttered or used, and then,by certain innuendoes, undertake to say that they were intended to be understood, and were understoodln the sense of imputing to the plaintiff the crime of grand larceny. In such case, the question *56 whether such meaning was intended by the person publishing the writing, or whether such meaning was understood by the person to whom it was published, becomes a question for the jury. We cannot say that the words,under the circumstances set forth, would not convey the meaning,ascribed to them. The question whether they bore that meaning then, would be a question that should be submitted to the jury. But it is necessary to allege and to prove that there were such circumstances as are alleged — that there was such a situation surrounding the transaction as would make it, at least, possible, if not probable, that the meaning ascribed to the words was the meaning intended, and the .meaning understood.
From the evidence submitted to the jury, it appears that the defendant had had some arrangement with a man by name of Anson Steele, under which Anson Steele had obtained from the defendant, Edwards, certain fodder, and was to obtain more fodder which he was to pay for. That the understanding between the parties was, that he was to pay for it before he removed it from the premises of Edwards, and it appears that Mr. Edwards did not know the Christian name of the Steele with whom he had been dealing with respect to this fodder. That on a certain day, he noticed a person going out of his field with a load of fodder; that he supposed this person to be the Steele that he had agreed to let have a load of fodder, and that the words that he used on that occasion, and the words which he wrote upon the postal card, were with respect to that transaction. It appears that he inquired where Mr. Steele lived, and went to the house where he was directed, and there found a load of fodder; that he supposed,' — taking his testimony for it, —that that was the residence of the Steele to whom he sold' the fodder. He was informed that it was the residence of Bert Steele, and he was still in ignorance of the fact that the person to whom he had agreed to sell the|fodder was *57 not Bert Steele. He did not find Mr. Steele at this house, but returned home and directed his daughter to write a postal card, calling upon Mr. Bert Steele, (whom he then supposed was the Steele to whom he had sold the fodder), to call and settle for what he had taken without permission, the understanding having been, that Steele was not to take the fodder until he had first paid for it. Now, it was upon that statement of the matter to the jury by witnesses, that the court withdrew the case from the consideration of the jury, that there was no testimony tending to show that the language had been used by Mr. Edwards in the libelous sense ascribed to it in the petition, It appears, however, that there was some testimony upon the part of Anson Steele, tending to show that Mr. Edwards had, upon the same day that he had called at the residence of Bert Steele, also called at the residence of Anson Steele, and that not finding the fodder there, he subsequently, upon meeting Anson Steele on the street, in conversation with him, said to him, “I did not find the fodder at your house, but I found it at the house of Bert Steele, and therefore, I have no claim upon you for the fodder. '1 There was some evidence tending to show that this occurred before Mr. Edwards had written this postal card, so that, if the matter were to go to the jury upon the question of what was intended and meant by Mr. Edwards, perhaps it could not be said there was no testimony tending to show that the words were intended by Mr. Edwards to be understood in the libelous sense charged.
But a question which is more important in the case is:— In what sense was the language understood, or in what sense might it have been understood by those to whom it was published? The intent of a person using language, is only inquired into as we understand it, upon the question of malice. The person using libelous language may intend to have it understood in an innocent sense, and yet may be held liable in a civil action for damages. Now, in what *58 sense other than the sense which Mr. Edwards says he used this language, could it have been understood by those to whom it was published? It becomes, important to inquire then, how, and to whom it was published, if at all. The postal card was written by the daughter of the defendant, at his residence. There is no testimony in the record tending to show that after it was so written, it came to the eyes of any other person, or that it was read in the presence or hearing of any other person than the defendant’s daughter. There are many authorities to the effect that it is not sufficient that one may have an opportunity to read a libelous writing to constitute a publication, but it must have been seen and read by, or to someone other than the writer, to make it a publication. It is no part of the business or duty of the post office officials to read a postal card; their doing so, would be an impropriety, if not an unlawful act, and it can hardly be presumed that they do, ordinarily, read the vast number of postal cards that go through the post offices. It would not do to ¿ssume, as a matter of law, that because a postal card has been placed in the post office, it has been read, since there has been an opportunity for the post office officials to read it Therefore, we do not regard the fact of the posting of the postal card at the post office as a publication of the matter written upon it. Technically, perhaps, it was a publication to the daughter. She was not the author of it, but was the amanuensis of the defendant, who can neither read nor write, and it may be said, that it was published to her because she wrote and necessarily read it. It does not appear that any other person ever read it or heard it read; therefore, it becomes important to know in what sense the daughter could have understood this language. Now, it does not appear so far as we have been able to find from- the record,that the daughter had been apprised or made acquainted, with any circumstances that would cause her to understand this language as meaning *59 that Steele had been guilty of grand larceny. She had simply been directed by her father to write a postal card to Bert Seele, to call and settle for the fodder which he had taken without permission. It is a very scant publication to say the least of it, but if it is technically a publication — it was published to one who personally had no knowledge of the surrounding circumstances that would cause her to think that the language used (which sseems to be more her own language than her father’s), imputed the crime of grand larceny to the person addressed. On this subject, I will read from sec. 135, of Townshend on Slander and Libel:
“In allowing extraneous circumstances to affect the construction of language, courts inquire whether or not, the hearer or reader of the language knew such circumstances. If the hearer or reader was acquainted with those extraneous circumstances, the construction will be with reference to them, not because it is impoftant how the reader or hearer understood the language, but because those circumstances form a proper element in determining the meaning to be attributed to the language in question. If the hearer or reader was not acquainted with those extraneous circumstances, then .they will not be taken into consideration in determining the meaning of the language. The hearer or reader not being acquainted with those circumstances which affect the meaning of the language,its effect upon such hearer or reader is as if no such circumstances existed, and the language is to be construed without reference to such circumstances. The circumstance that the act charged is physically or legally impossible, does not always prevent the language being actionable. The alleged test in such case is the knowledge possessed by those to whom the language is published.”
And there are various illustrations given in the text. In the case of Brown v. Myers,in 40 Ohio St.,p. 99,it is held, that language which otherwise- would be actionable, might not be actionable if published under circumstances, or to parties acquainted with the circumstances, which would give to the language a meaning that would not be actionable. *60 That is the converse of the proposition which I have just stated, but is founded on like principles.
In this connection we will consider the question of the sufficiency of the petition, though it was not demurred to. I have called attention to the fact that the petition sets forth that before the committing of the grievance complained of, that is to say, before the publishing of this card, the defendant had asserted that a certain load of fodder, to him, the defendant belonging, had been feloniously stolen, taken and carried away. There was no testimony tending to show that he had ever made such a charge or declaration; but even if that had been shown, there is no allegation that any person to whom the language was published, knew of sucb charge or declaration, or was acquainted with any circumstance which would cause such person to understand the language as imputing to Mr. Steele the crime of larceny. It is not only necessary to prove that, but it is necessary to allege it, or, to state it more logically, it is necessary to allege it and to support the allegation by proof. In the ease of Maynard v. Firemen’s Fund Insurance Co., 34 Cal., 48, (also 91 Am. Dec., at p. 672), the court say:
“The averment in that complaint is, that the defendant intended to have it understood and believed by the language of the resolution, that the plaintiff was dismissed by the defendant because of dishonesty and want of ability to discharge and perform the duties of his occupation, and that he was wholly unfit and unworthy of employment; and further, that to consummate the wrong intended, the defendant caused the resolution to be published among the plaintiff’s acquaintances, and communicated the same to the insurance companies named in the complaint. This may be sufficient to show what the defendant meant by the language used and published, but this alone is not enough.
“How the resolution was understood by those who read it, other than those who composed and published it, the complaint does not state. The plaintiff’s acquaintances and tbe *61 officers of the insurance companies, amongst whom the resolution was circulated, if they read it, may not have understood it as importing anything to the discredit of plaintiff. It is admissible in actions of slander and libel, to aver and prove that the words alleged to be defamatory, and which have a covert or ambiguous meaning, were intended and used with the object of defaming, and were understood in a particular defamatory sense by those who heard them as the case may be. In Woolnoth v. Meadows, 5 East, 463, which was an action of slander, the words were of doubtful import, and the declaration, after the usual introductory matter and setting forth of the words, contained an express averment, that they were uttered and published by the defendant, with intent and meaning to convey, that the same were by the person in whose presence they were uttered and published, understood and believed to convey a charge of the particular crime mentioned in the declaration. Lord Ellenborough, Chief Justice, in his opinion, speaking of the averment, said: ‘Upon a count so framed, the plaintiff must have gone into other proof than the mere speaking of the words, and he must have not only shown that the defendant’s meaning was to impute a crime of that nature to the plaintiff, but that the words were so understood by the hearers.’ ”
The judge presiding in this case, says:
“The complaint does not aver that those who were furnished with the resolution,or copy of it,read it,or that,if they did, they understood it to impute to the plaintiff want of honesty or business capacity. The rule is, that the allegations and proofs must correspond, and the consequence of the rule is another, which is, that the evidence of a matter of fact essential to the support of the action, cannot be heard unless the complaint or other proper pleading contains an averment of such essential matter or fact, Upon the subject of showing by pleading what was intended by the alleged libelous words, and in what sense they were understood by those to whom they were published, we may, in addition to the case cited, refer to Goodrich v. Wolcott, 3 Cow., 239; Andrews v. Woodmansie, 15 Wend., 234; Gibson v. Williams, 4 Wend., 320; Dexter v. Taber, 12 Johns., 239; and Peake v. Oldham, 1 Cow., 275. All these authorities bear more *62 or less upon the questions considered, and maybe read with profit by those who are interested in mastering this branch of the law.”
James & Beverstoclc, for Plaintiff
James 0. Troup, for Defendant.
We hold that the petition, counting upon language which is not libelous in itself, is faulty and insufficient, because it does not allege that the persons to whom the matter was published, were acquainted with facts which caused it to convey to them a libelous meaning,and that there is no evidence tending to show that it was so understood, or might have been,by the persons to whom i.t was published. Therefore, we think the court of common pleas did not err in taking the case from the jury, and the judgment will be affirmed.